AMERICAN EMPLOYERS' INS. CO. v.
KELLUM et al.

No. 13582.

Court of Civil Appeals of Texas. Dallas.

Dec. 22, 1944.

Rehearing Denied Jan. 19, 1945.

W. B. Handley, of Dallas, for appellant.

Bruce Graham, of Dallas, for appellees.

BOND, Chief Justice.

This is a compensation suit. J. H. Kellum, husband of Mrs. Grace Kellum, was plaintiff in the court below, and American Employers' Insurance Company, the insurance carrier of Rubenstein Produce Company, was defendant. For convenience, the parties will be designated here as they were in the trial court.

On trial to a jury, verdict was rendered, finding that Mrs. Grace Kellum sustained an accidental injury while working as an employe of Rubenstein Produce Company, resulting in her permanent and total incapacity to perform the usual tasks of a workman, and to procure and retain such employment for the remainder of her lifetime; and that she sustained no partial incapacity as a natural result of such injury. The judge found all necessary jurisdictional facts, the compensation wage rate applicable in the case, and entered judgment in favor of the plaintiff against the insurance carrier for $5,174, one-third payable to his attorney.

The points of error involved in this appeal relate exclusively to (a) misconduct of Mrs. Kellum while testifying as a witness, (b) improper argument by plaintiff's attorney, and (c) the jury findings of total and permanent disability as being against the weight and preponderance of the evi-

dence. The assignments are grouped, presenting that the combination of such errors and the amount of judgment awarded conclusively show that the jury was actuated by bias and prejudice against the defendant as to warrant a new trial.

On trial plaintiff relied exclusively upon the testimony of his wife as to the facts and circumstances of how she sustained the alleged injuries. She testified that she was employed by Rubenstein Produce Company to candle and crate eggs by passing the eggs in front of her under an electric light bulb; that she worked at a table about two and one-half feet high, and long and wide enough for twelve women at the same time and kind of employment, to work on either side of the table; that eggs were delivered on the table in wooden crates, made of thin lumber on the sides and heavier lumber at the ends, containing thirty dozen eggs, weighing approximately 55 pounds; that on the occasion in question she was performing her duties, when a full crate was delivered and shoved across the table, which had become slick from broken eggs, with sufficient force to contact the crate from which she was then removing eggs; that the impact of the two cases caused the crate out of which she was working to hit her on the left side of her body and stomach, resulting in "knocking her out"—unconscious. Mrs. Kellum further testified that when she recovered consciousness, two of the women employes had hold of her and led her to the ladies' restroom, where it was discovered that she was profusely menstruating—flooding as she termed it; and that after resting for about an hour she came back to her place at the table and, under some adverse difficulties, worked the balance of the day and continued such work uninterruptedly for about ten days, when she was required because of her physical condition, to cease work. Mrs. Kellum gave evidence of pain in her side, periods of irregular and profuse menstruation, passing of clotted blood, and other physical disabilities resulting in nervousness, sleeplessness and loss of weight which caused her to be unable to do her household duties. Further she testified of objective and subjective symptoms as the result of the injuries, which were corroborated by plaintiff's husband, and, hypothetically, by M. A. Schalck, Doctor of Osteopathy. Mrs. Kellum was 43 years of age, weighed 138 pounds, healthy and strong, and had never before suffered the physical pains and disabilities that she afterward experienced.

It will be observed from the record that there is no evidence that any of the eggs were broken in either of the crates involved in the transaction; no evidence of bruise, tear or rupture of the abdominal walls, skin, blood vessels, or muscles of Mrs. Kellum; no physician who had ever treated her for such injuries testified in her behalf; and none of the twenty-three ladies working with Mrs. Kellum at the time and place of the alleged accident testified or gave evidence of the related occurrence. The physician of her own choice, Dr. Schuett, was not called as a witness.

The alleged accident occurred on February 24, 1943, and it is in evidence that plaintiff did not call upon a physician to see his wife until March 8, 1943, when she was directed by her employer to go to Dr. Gibbons for examination and treatment. Dr. Gibbons testified, after qualifying as a graduate of the University of Texas School of Medicine, interned at St. Paul's Hospital at Dallas, reviewed studies at Mayo Clinic, Campbell's Clinic and Clinics in Kansas City, and for twenty-four years chief surgeon in Samuell Clinic at Dallas, Texas, that on March 8, 1943, Mrs. Kellum called to see him professionally, complaining of soreness and pain in the lower left side of her abdomen and profuse menstruation; that he made an examination of her at that time, and aside from the soreness and tenderness which he attributed to the injury, he found no deformity of her female organs, although the uterus was slightly enlarged; that Mrs. Kellum continued her visits, and in April and May, 1943, he made further examination and at that time he was able to palpate a small fibroid tumor, which caused the enlargement of the uterus, the disturbance in menstruation, and, to a certain extent, affected blood circulation. Dr. Gibbons further testified that from his examination and X-ray disclosures, the pelves were negative of any deformity or change in the bones, and her blood count was normal; that in his opinion the injury had no connection whatsoever with the condition of her female organs; that her prolonged condition was brought about by the tumor, and that such condition may reasonably be expected in women of her age, approaching menopause.

Subsequently, in June, 1943, Mrs. Kellum changed physicians; went to Dr. Schuett for examination, and, after his examination and prescribed treatment, Mrs. Kellum never again called upon him to examine or further administer for her troubles, nor did she call upon any other physician, until two or three days before trial of this cause, when she went to Dr. Schalck. Dr. Schalck testified, after qualifying as a graduate of Kirksville College of Osteopathy and Surgery, attended Illinois School of Medicine and took post graduate course at Kirksville College and practiced osteopathy in Dallas since 1928, that he tentatively examined Mrs. Kellum, not as fully and completely as he would have liked from a physical standpoint; but from the history presented of her troubles,—the occurrence of the injury, pain and menstrual disturbances, and the rigidity of the muscles in the affected parts, it was his opinion that the accident was directly related to her present condition; and that, on basis of the related hypothesis, a blood clot was formed, caused by traumatic injury, and her disabilities were total and permanent, to disable her from doing any more work requiring her to be on her feet.

■ The basis for the assignment of error involving misconduct of Mrs. Kellum, while testifying as a witness, is that she was asked by plaintiff's attorney:

"Q. Do you have any children? A. I have three in the service and a daughter in Beaumont.

"Q. That makes how many altogether? A. Four.

"Q. Four children? A. Yes, sir.

"Q. Now, are they small ones, or all grown? A. They are all grown, three in the service, and the other is married and in Beaumont. * * *

"Q. Now what kind of work did you do? A. Graded eggs for the Government."

It is obvious that the answers to the questions propounded were not responsive, immaterial and calculated to bring to the mind of the jury the fact that she and her husband were contributing a patriotic service by having three sons in the World War, and that she, too, was working for the Government to supply necessary food for the soldiers. Error is conceded; the trial court promptly admonished the jury to disregard the testimony, but evidently the effect of it at this crucial war moment, could not be

disregarded; whereas, in peace times it would hardly have been noticed.

Dr. Schuett never having been called as a witness, his absence on trial of the case is the basis of defendant's assignment of improper argument by plaintiff's attorney. In anticipation of argument by defendant's attorney that adverse inference might reasonably be drawn from Dr. Schuett's failure to testify, plaintiff's attorney related to the court, in absence of the jury, that he called upon Dr. Schuett at his office to get him to come to court and testify in the case; and asked the doctor if he would willingly come, and that he told him he would not under any circumstances, and, if he was forced to come under process of the court, he would do the plaintiff no good. This was advanced by plaintiff as a guide to the court in passing on the relevancy of plaintiff's reply to any argument or criticism, by defendant's attorney, of plaintiff's failure to produce Dr. Schuett. In closing argument, the incidents complained of are the following excerpts from plaintiff's argument to the jury:

" * * * Then she immediately goes to another doctor, and then he hollers about why Dr. Schuett was not down here. I told you why he wasn't down here. I knew he was going to argue that thing and then in that same connection while we adjourned court—didn't we so he could get Dr. Gibbons? We adjourned court, waited, I don't recall just how long. We didn't have any court yesterday afternoon, waiting on Dr. Gibbons.

"Mr. Handley: Your honor, I think that is unfair and improper comment.

"Mr. Graham: Well, I am answering his argument.

"Mr. Handley: That is in control of the court and the parties are not chargeable with it one way or the other.

"The Court: I will take the point under advisement. Failure to rule would be equivalent to an adverse ruling. You may have your record."

Then again, plaintiff's attorney argued as follows: " * * * Here is another thing: He says that Dr. Schuett, the only implication that can be drawn because Dr. Schuett isn't here, that if he were down here he might testify to the truth. Well, he didn't say what the truth was, but I certainly draw this further implication, that the truth wouldn't have helped the insurance company because they would

have had him down here. Talking about our being open to process. Talking that we had the processes of the court to bring him down, therefore, why, men, don't you know that it is open to him like it is to me? If Dr. Schuett knew anything that was going to help him don't you think, couldn't he have had him down here and don't you think they would have done it? If there is any implication in this matter it goes both ways on the situation, but the court says we are not considering what is not here. We are considering what is here * * *".

The court qualified the bills of exception to each of the above-quoted excerpts from the argument of plaintiff's counsel, that it "occurred after defendant's counsel had argued to the jury, that Dr. Schuett, who had examined plaintiff's wife, was not brought to court under process; that the process of the court was open to plaintiff to compel Dr. Schuett to attend court, and that the only implication that could be drawn from plaintiff's failure to bring said doctor to court was that if the doctor were present, he, the doctor, would tell the truth. There is no evidence before the jury as to what the doctor would or would not have testified to, had he been present. Defendant excepts to such qualification."

██ It will be observed from the arguments and the qualification to the bills of exception that Dr. Schuett did not testify, and the defendant's attorney did not argue, as to what he would have testified, had he been brought to court under process. The only reference made was that "the doctor would tell the truth." The "truth" of one's testimony is presumed, in absence of some discrediting evidence. And then, too, the jury was entitled to consider the failure of the plaintiff to produce Dr. Schuett, and his absence was a pertinent basis for the jury to draw the inference that he would not testify favorably to plaintiff. It is in evidence that Dr. Schuett was plaintiff's physician, selected by him for examination and treatment of his wife, and that he told the attorney making the argument that if he was made to come to court he would not do the plaintiff any good. True, indeed, the process of the court was open to either side to have Dr. Schuett present, and argument was appropriate to either party to draw their own conclusion from his absence; but under the circumstances of this case, the implication that he would give evidence against defendant does not arise

from defendant's statement that he would tell the truth. The jury had a right to consider his absence, and naturally would conclude that he would "tell the truth" about Mrs. Kellum's condition, whatever it might have been. The bills of exception, approved by the judge, relate that "the court says we are not considering what is not here, we are considering what is here". This, we think, was an erroneous admonition, calculated to impress the jury with the idea that they could not consider the failure of plaintiff to produce his family physician as a witness, or draw their own deductions from such failure.

██ Applying principles of law which have been announced and adhered to by courts of this State, that transgressions of misconduct and improper argument by a party, or party in interest, imposes upon the person in whose favor such transgressions were made, to rebut the record of bias and prejudice that no harmless error occurred on account of such transgressions, "the adverse complaining party is entitled to a reversal of the judgment, as a matter of law, if, under all the circumstances there is any reasonable doubt of its harmful effect, or unless it affirmatively appears no prejudice resulted." Chapin v. Putnam Supply Co. et al., 124 Tex. 247, 76 S.W.2d 469, 470. If misconduct or improper argument be clearly material, the presumption is that such transgressions had a prejudicial effect; but we need not indulge in presumption, we think the effect is shown here.

██ In this case we are constrained to hold that the above combination of errors, the amount awarded under the disclosed testimony, and the failure to produce on trial evidence of material nature, warrant a new trial. Manifestly, the jury was moved by sympathy or bias in favor of the parents of three sons in the United States Army, and that the mother was working for the Government to support the soldiers in battle. On another trial such prejudicial errors may not occur, and other available testimony suggested in the record may be secured; thus a full disclosure of the occurrence and extent of injury may be related, and judgment rendered free of prejudicial matters. Appellant having moved for new trial, we think it should have been granted for the reasons above stated.

The judgment of the court below is reversed and cause remanded.