**ÆTNA CASUALTY & SURETY CO. v. DAVIS.**

**No. 13664.**

Court of Civil Appeals of Texas. Dallas.

Feb. 15, 1946.

On Rehearing April 26, 1946.

Rehearing Denied May 24, 1946.

R. T. Bailey, of Dallas, for appellant.

White & Yarborough, of Dallas, for appellee.

BOND, Chief Justice.

This is a workman's compensation case. De George's Restaurant was the employer, Ardell Davis the employe, and Aetna Casualty & Surety Company the insurer. Davis sought compensation for 75 per cent partial loss of vision in his left eye and 25 per cent partial loss of vision in his right eye, claimed to have resulted "when on or about the first day of January 1944, some lye-water with which he was washing pots and pans (restaurant kitchen utensils) splashed into his left eye." During the trial Davis filed new pleadings claiming 100 per cent total and permanent loss of his vision in the left eye. As a result of trial to a jury, judgment was entered for total and permanent loss of vision in the left eye and 7 per cent partial permanent loss of vision in the right eye—all based on a compensation rate of $26 as Davis's "average weekly wage" during the year immediately preceding date of injury.

Appellant predicates error on the findings of the jury and judgment of the court that Davis's "average weekly wage" during the year immediately preceding his injury was $26, as having no support in evidence to justify such verdict and judgment for compensation liability in the sum of $15.60 for 100 weeks for total and permanent loss of vision in his left eye, and for $1.09 for 100 weeks for 7 per cent permanent partial disability of his right eye.

The evidence is uncontroverted that, at the time of Davis's alleged injury, he was a dish or pot washer at De George's Restaurant and had been so engaged for nearly two months before he got hurt; that during the year before he was employed at De George's, he was steadily engaged 8 or 9 months in washing and cleaning baking machinery, cooking utensils and mixers for Wonder Bread Baking Company and other bakeries in the City of Dallas; that his weekly wage at De George's was $20 for a six-day week, $3 for the extra day, and two meals equivalent to $3 per week, making his total average $26 per week. There is no evidence, other than the negative testimony of Davis and an auditor or bookkeeper for a number of restaurants in the City of Dallas, that they did not know of any other employe of the same class as Davis who had worked substantially the whole of the immediate preceding year in the same or similar employment; and Davis did not give evidence as to what he received for the 8 or 9 months before working for De George's Restaurant.

The jury, in answer to special issues 1, 2, 3, 4 and 5, found in effect that Davis sustained total and permanent incapacity to his left eye and 7 per cent partial and permanent incapacity to his right eye, as a natural result of the accidental injury; and to issues 12, 13 and 16, that Davis had worked in the same class of employment as that in which he was working at time of his injury, substantially the whole of the year immediately preceding the date of such injury, at an "average weekly wage" of $26 per week, designating such wage as being "just and fair to both parties."

The "average weekly wage" of Ardell Davis was, in pleadings and evidence, a disputed fact issue. The trial court recognized the dispute by submitting contingent special issues 14 and 15 (to be answered by the jury only in event of negative answers to 12 and 13), as to whether Davis had worked substantially the whole of the year, and whether or not there were other employes of the same class as plaintiff who had worked substantially the whole of the year immediately preceding the date of plaintiff's injury, in the same or similar employment as that engaged in by Ardell Davis, and, if so, the amount of such wages. Thus having submitted, although conditionally, the alternative issues, the presumption must be indulged that there was evidence satisfactory to the court to sustain such

submission. Patterson v. Texas Employers Ins. Ass'n, Tex.Civ.App., 188 S.W.2d 778, Tex.Sup., 192 S.W.2d 255. These alternative contingent issues, 14 and 15, were not answered by the jury; hence the jury had no scale or guide from which to compute weekly wage findings for the claimant.

Under Art. 8309, sec. 1, subsection 1, it is provided, in effect, that if the injured employe shall have worked in the same employment in which he was engaged at the time of the injury substantially the whole of the year preceding such injury, his average annual wages shall be thus computed. Subsection 2 provides that if the injured employe shall not have worked in the same employment during substantially the whole of the year preceding the injury, his average weekly wage shall be computed from the employment of other employes working in the same class of work, in the same or a neighboring place. Subsection 3 provides that if neither of the subsections 1 and 2 are applicable, or if they are impracticable to compute the average weekly wage, then it shall be computed by the court in any manner which may seem "just and fair to both parties." In the case of American Employers Ins. Co. v. Singleton, 24 S.W.2d 26, 27, the Supreme Court laid down the rule that has been followed ever since: "Under the express provisions of section 5 of article 8307, R.C.S. of Texas 1925, the burden of proof is on * * * a party claiming compensation, to offer legal evidence establishing an average weekly wage * * * under one of the three subsections of the statute above quoted. Furthermore, under the statute the burden is on the claimant to show by competent evidence that it is impracticable to compute the average weekly wage under either subsections 1 or 2 before subsection 3 can be resorted to. Likewise, the burden is on the claimant to show that compensation cannot be computed under subsection 1 before subsection 2 is resorted to."

In this case, it having affirmatively appeared that Davis worked 2 months at De George's Restaurant and 8 or 9 months at Wonder Bakery and other bakeries in the same class of employment as he did at De George's, in absence of proof as to what he received for the 8 or 9 months, the jury was without a basis to compute his average weekly wage. It might be said under some circumstances that the negative testimony of Davis and an auditor for restaurants in Dallas that they did not know of any other person in the same or a neighboring place who worked substantially a year before the injury, would raise an issue to compute the wage under subsection 3, as was done by the jury; but, where the claimant himself testified that he had worked practically the whole year, and offered no evidence whatsoever to overcome the requirements of subsection 1 as to make subsection 2 or 3 available for computation of his wage, the jury could not determine the "average weekly wage," under subsection 3. It was incumbent on the injured employe to come under that subsection, to show not only that he did not work substantially the whole of the year immediately preceding the injury, but also to show that no other person had worked substantially the whole of the year. If he did work the year, as he testified, it was incumbent upon him to show his earnings, or salary, for that time, thus coming under subsection 1.

Furthermore, appellant challenged the form of special issues 2 and 3 pertaining to "total and permanent incapacity of Davis's left eye" and the supplementary charge incident to such issues. Issues 2 and 3 make inquiry as to whether or not Davis sustained "total and permanent *incapacity* of his eye," and the charge submitted is: "You are instructed that the phrase 'total incapacity of his eye' as used in the Court's charge means total loss of use of the eye; it does not imply an absolute disability to perform any kind of labor, but such incapacity of the eye that it disqualifies a person from performing the usual task of a workman in such a way as to enable him to procure and retain employment requiring the use of the eye, is ordinarily regarded as total incapacity of the eye." Appellant excepted to the charge and the issues submitted as being beside the record, the evidence being insufficient to show the loss of vision in his left eye, and incompetent to show that his eye could not be materially benefited, if not restored to normal, by the use of eyeglasses; and

sought to have the court submit in the charge as to whether Davis sustained total and permanent "loss of the sight of his eye" instead of the issue as submitted for "total and permanent *incapacity* of the eye"; and also to include in the definition of "total loss of vision" that it is such vision as "could not be benefited or restored to normal by the use of glasses."

Article 8306, § 12, of the Workmen's Compensation Act, provides: "For the total and permanent loss of the sight of one eye, sixty per cent of the average weekly wages during one hundred weeks * * *." It will be seen that compensation for total and permanent loss of the sight of one eye is not measured by the lessened earning capacity of the injured employe, or that such loss of sight had to be such as to disqualify the person from performing the usual tasks of a workman. Incapacity to labor is not a condition precedent to compensation for total and permanent loss of the sight of one eye. Total and permanent loss of the sight of an eye is compensable regardless of whether or not the employe shall be able to perform any task of a workman. It is a specific injury for which specific compensation is provided. So when the court instructed the jury, in effect, that the "total *incapacity* of Davis's left eye" implied the incapacity to labor as to disqualify him from performing the usual tasks of a workman, it lessened the burden on plaintiff to prove his total and permanent loss of use of the sight. The burden was upon the claimant to show by preponderance of the evidence that he lost the total and permanent sight of his left eye in the course of his employment; that is, that his eye had no usable vision as a result of his injury. The evidence having raised the issue of whether usable sight did exist, and, if usable, either with or without glasses, the claimant could not recover for total and permanent loss of the sight of the eye. If the use of glasses would restore the sight to normal, or to a usable degree below normal, certainly it could not be said that the loss of sight was total and permanent. Total and permanent loss of the sight of an eye, that is, usable sight, must be such that the sight is gone, all of the sight to the extent that it could not be restored in any usable degree.

In Cline v. Studebaker Corporation, 189 Mich. 514, 155 N.W. 519, 521, L.R.A.1916C, 1139, under facts similar as here, the Supreme Court of Michigan held: "Under these circumstances it seems impossible to say that the injury has resulted in the loss of the eye. The use of glasses is a very ordinary occurrence, both by the young and the old. It is unnecessary to determine whether the loss of 90 per cent. of the sight is substantially the loss of the eye, because that is not the present case. Ninety per cent. of the sight is not lost when it can be diminished to 50 per cent. by the use of common appliances. And it is the duty of the sufferer to minimize the injury as much as he reasonably may." See also Valentine v. Sherwood, etc., 189 App.Div. 410, 178 N.Y.S. 494. So, in Travelers Ins. Co. v. Richmond, Tex.Com.App., 291 S.W. 1085, 1086, another fact case similar as here, our Supreme Court said: "Vision is considered to be a sense for the use of which the eye is a designed agency, and it is to be assumed that the faculty itself remains even though an essential agency be completely destroyed. If the agency be but impaired, the faculty is but thwarted pro tanto. For such a case as that before us science has devised appliances which, in substantial part at least, supply the destroyed parts of the agency which nature designed. Through these artificial means, or through those means employed in aid of nature, the sense functions. A solecism exists in a declaration that that which may be recovered is lost, and there is manifest contradiction of terms is saying that a sense, or emotion, which is merely suspended in whole or part for a time and which becomes active again is permanently lost. In our view, the record exhibits undoubted proof that 'the sight of one eye' is not totally and permanently lost'."

It will be further seen from the record before us that Davis did not testify to any impairment of his ability to work because of the loss of eyesight, and the statute does not award compensation measured by the lessened ability to work. The allowance is made under the schedule of fixed

liabilities. Davis's eyes were examined for loss of sight by Doctors Harrington, Knowles, and Brann, eye, ear, nose and throat specialists. Dr. Harrington made tests separately and in the presence of a Dr. Jenkins, aimed to discover how much the claimant could see when using proper eyeglasses, and found that with this assistance he had normal vision in both eyes on January 26, 1944, and on date of trial. The doctor testified that on January 14, 1944, when he first examined Davis, his vision was 20/80, that is, he could see at 20 feet what he normally should see at 80 feet, as the result of chronic myopia (nearsightedness); and the doctor further testified that he, with a Dr. Jenkins, found no resulting defect in either of Davis's eyes, his sight was 20/20, or normal, with the use of glasses. Dr. Knowles made similar tests, separately from the other doctors, also with a view to discovering the degree of vision in Davis's eyes, and testified that he found Davis suffering from nearsightedness, that at his age (45) the condition of his eyes was what one would expect to find in a man of that age, that he found no scar or scar tissue on the eye, and that upon tests, found that glasses would improve his sight. Dr. Brann examined Davis on April 19, 1944, gave evidence of injury to his left eye, that at that time the vision in the left eye was about 20/80 (one-third normal), and that his right eye was normal; testified that on February 19, 1945, he again examined Davis's eyes, and said that in his opinion the left eye "for all practical purposes, for useful purposes, is practically nil * * * practically nothing. Could see light and see outlines of a big object." He testified further that in the right eye—due to strain "because it is doing all the work, being constantly used"—the loss of sight at that time was about 6 or 7 per cent. On cross-examination, Dr. Brann testified that he made no particular effort to treat Davis's eyes, only outlined treatment with ointment, and made no tests to see whether glasses would improve his vision. He said that in his opinion glasses would not improve Davis's left eye, but might help the right eye. But as to this, he would not say how much glasses would help, "because it is utterly impossible to say"; indeed, he said glasses would "take the strain off of that eye," but that he had doubts as to whether glasses would help the vision in the left eye, and could not know about that until he tried glasses. In the course of trial, attorneys for both parties seem to have agreed for the court to appoint two physicians to examine claimant's eyes, choice of selection accorded to each side respectively. Dr. Harrington and Dr. Jenkins were selected to serve. Dr. Harrington, witness for defendant, gave the testimony as related above; Dr. Jenkins, although available, was not called, but Dr. Harrington testified, without objection, that he examined claimant in the presence of Dr. Jenkins, and that Dr. Jenkins examined claimant's eyes and said to him that "he found nothing wrong with the eyes."

It will be seen that the positive net result of the vision tests made by the two medical experts was, that with the aid of glasses claimant had normal sight; that the opinion of the one medical expert, who made no test with glasses, was to the effect that the vision in the left eye would not be improved, but that glasses might be helpful to the right eye by relieving strain in that eye.

We think it clear that appellant was entitled to have the court's charge include the effect of glasses as touching the usability of the sight of the eyes, and that the court erred in limiting the charge in defining "total incapacity of Davis's eyes," implying disqualification to work, and in failing to include therein the effectiveness of glasses in determining the loss of vision. Furthermore, the court erred in submitting special issue 16 for the jury to determine the employe's "average weekly wage" under the 3rd subsection, Art. 8309, § 1, and the instructions incident thereto. "Special Issue 16. From a preponderance of the evidence, what sum of money do you designate as the average weekly wage of the plaintiff, Ardell Davis, which you deem just and fair to both parties, plaintiff and defendant? * * * Answer: $26.00 per week." The instruction given in connection with the issue: "In connection with the foregoing special issue you are instructed that you may determine the weekly

wage in any way and manner that seems just and fair to both parties under the evidence, and his wages may include the market value of board and other advantages which can be estimated in money which the employe receives from the employer as part of his remuneration." Evidently the finding of the jury that appellee's "average weekly wage" was "fair and just to both parties" is based on the wages appellee had been receiving from De George's, for whom he had worked two months at the time of his injury; and, under the charge of the court, the $26 is the only amount the jury could have found. The language "in any manner which seems just and fair," as used in the statute, fixes a general but not an arbitrary rule for computing "average weekly wages." "Such wages should be ascertained from all the facts and circumstances pertinent to such issue in order to impartially determine the compensation in a manner legally fair and just." Texas Employers Ins. Ass'n v. Van Pelt, Tex.Civ.App., 68 S.W.2d 514, 516. The wages should not be determined, as stated in the court's charge, by the employe's "wages to include the *market value* of board and other advantages which can be estimated in money," etc., in the light of the testimony in this case. The injured employe worked for De George's Restaurant only two months as a dish or pot washer, at an amount made up of three items: $20 weekly wages, $3 value of meals, and $3 for the extra day in the week, making the total $26. No other fact or circumstance was presented to the jury in determining the issue as would be "fair and just to both parties." In limiting the consideration of these items to the time of the claimed injury, the court might as well have stated and instructed the jury that, as a matter of law, the "average weekly wage" of appellee is $26 and they should find accordingly. Davis having worked 8 or 9 months during the year before he was employed at De George's Restaurant, in the same class of employment, in absence of testimony as to his average weekly wage for that length of time, the jury should not be allowed to speculate that his average weekly wage should be determined under the 3rd subsection of the statute. We

think it was not impracticable to compute the average weekly wage as defined in the 2nd subsection, had appellee disclosed his earning or salary for practically the year before his injury, which he is compelled to do in order to give the jury some basis for finding the wage.

Appellant presents point of error in the Court's action in permitting the plaintiff to testify that he had a son in the army overseas. When plaintiff was placed on the witness stand, about the first question propounded to him, answers and exceptions thereto, were as follows:

"Q. Do you have a son who is now overseas in the service? A. Yes, sir.

"Mr. Bailey: We object to that. I don't see it has any bearing. That doesn't show this boy got hurt.

"Mr. Yarborough: It shows the credibility of the witness.

"The Court: Overruled.

"Mr. Bailey: Note our exception.

"Q. (By Mr. Yarborough): How long has he been overseas? A. It will soon be two years.

"Mr. Bailey: Note our exception for the same reason.

"The Court: Overruled.

"Mr. Bailey: Note our exception."

Manifestly, the evidence is not admissible for any purpose in this case other than to effect sympathy or bias in favor of the soldier's father; the mere fact that the son was in the army overseas for two years could have no appreciable effect touching the credibility of the father and the weight to be given his testimony on the issues involved in this suit. On another trial such prejudicial error may not occur; and, in view of this being the second admonition of error for such matters American Employers Ins. Co. v. Kellum et al., Tex.Civ.App., 185 S.W.2d 113, we may expect proper observance of the rules of evidence to avoid such occurrences that the trial may be free of prejudicial disclosures.

From the record above related, the judgment of the court below is reversed and cause remanded.

Reversed and remanded.

On Rehearing.

YOUNG, Justice.

Upon careful study of the record, appellee's motion for rehearing must be sustained. In lieu of our original opinion remanding this cause, the following will be substituted as our opinion of affirmance, Mr. BOND, Chief Justice, dissenting:

This is a compensation suit under sec. 12, Art. 8306, Vernon's Ann.Civ.St.; appellee Davis alleging in trial pleading that about January 1, 1944, while employed by the De George Cafe, Dallas, as a "pot washer," some lye-water splashed into his left eye, resulting in total and permanent loss of use of said member; also partial disability to his right eye "insofar as the performance of manual labor is concerned." The judgment, following jury verdict adverse to appellant insurer, was for 100 weeks of total incapacity to plaintiff's left eye and 7 per cent permanent incapacity to right eye, based on a compensation rate arrived at by using $26 as his "average weekly wage."

Referring to subsection 1, Art. 8309, § 1, Vernon's Ann.Civ.St., the jury answered "Yes" to issue 12 that plaintiff Ardell Davis had worked in the same employment in which he was working at the time of injury, whether for same employer or not, substantially the whole of the year immediately preceding date of injuries in question; and to issue 13, that $26 was his average weekly wage during such preceding year; also fixing the same amount ($26 per week) as their answer to issue 16, reading: "From a preponderance of the evidence, what sum of money do you designate as the average weekly wage of the plaintiff, Ardell Davis, which you deem just and fair to both parties, plaintiff and defendant?"

Summarized, insurer's points of appeal are: (1) Though evidence sustained the jury answer to issue 12 that plaintiff was engaged in the same employment for substantially the whole of the year immediately preceding date of injury, there was no evidence of earnings during that period; hence, the jury finding under issue 13 that $26 was plaintiff's average weekly wage for the year prior to injury was wholly without evidence in support; (2) testimony adduced

on the trial showing that regardless of the cause of impairment to claimant's vision, it could be restored to normal by use of glasses, the court's definition of "total incapacity of eye" should have included such theory so as to permit the jury to consider such evidence in arriving at any answer to issue 2 involving total incapacity of plaintiff's left eye; (3) insufficiency of evidence to sustain the finding of total loss of vision of plaintiff's left eye; the testimony being that without glasses he still had some vision, and with glasses it was improved; (4) evidence inclusive of claimant's age, previous employment, earning capacity, etc., should be considered in arriving at a determination of average weekly wage under subsection 3, Art. 8309, § 1 (just and fair to both parties); and the court erred in instructing the jury, in effect, that whatever they might find plaintiff's earnings at time of injury would constitute a "just and fair" weekly wage; (5) error of the court in permitting plaintiff to testify over objection that he had a son in the overseas army, because such statement was immaterial to any issue touching extent of his disability, and highly prejudicial to defendant's rights.

■ Apropos of issue 12 (inquiry if plaintiff had been in the same employment substantially the whole of the year preceding injury, Art. 8309, § 1, subsection 1), we conclude that its submission was not warranted under the record. Testimony on the issue was by plaintiff and another in his behalf, defendant offering no evidence thereon. Davis testified that he had been employed at the De George Cafe as pot washer for about 7 weeks before the accident of January 1944; his only other identified employment during 1943 being with Wonder Bread Company, cleaning up "cooking machinery and mixers" or washing "the mixer in the bakery," doing that kind of work some 8 or 9 months. There was no evidence of what he earned with the Wonder Company or other employers during the preceding year, all evidence as to wages relating to his employment with the De George Cafe; there receiving $20 per week of 6 days, plus $3 allowance for meals and $3 paid each Tuesday when the restaurant was closed for purpose of cleaning up. He further testified to questions:

42

"* * * Ardell, before this accident happened had you worked exactly 300 days, or near to or close to 300 days in that employment or in any employment in the year immediately preceding the day that you got hurt? A. No sir.

"Q. Do you know of anybody else in Dallas County who was doing the same or similar work that you were doing when you got hurt, the same or similar employment or in this vicinity who worked exactly 300 days or near to or close to 300 days in the year immediately preceding the date you got hurt? A. No sir, I don't."

A Mr. Thomas, bookkeeper for De George, also for various other Dallas cafes, testified, viz.:

"Q. Do you know any employee of De George's Restaurant that worked as much as 300 days or near to or close to 300 days in the year immediately preceding January 1944? * * * A. Not with me, and I really don't know whether there is one on the payroll record that has. I would like to say this, I know that type of help in cafes and restaurants in the City of Dallas don't stay on any one job very long at a time.

"Mr. Yarborough: Was that the condition existing throughout this vicinity in 1943? A. It was. I have about 25 cafes I keep books for, and I think I can truthfully say they won't stay on the job over two or three weeks at a time.

"Q. Do you know any of that 25 you keep books for of a pot washer or dish washer doing the work of that kind and character and nature in Dallas or the surrounding vicinity who worked as much as 300 days or close to or near 300 days in the year immediately preceding January 1st, or any date on down through the 15th of January in any year immediately preceding that date? A. No sir, I don't. * * *

"Q. Do you know of any in the whole 25 cafes you keep books for during that period of time that worked as much as even 200 days doing the type of work I have just described? A. No, I really don't."

It would appear that the foregoing testimony conclusively demonstrates the inapplicability of either subsection 1 or 2, Art. 8309, § 1, as a basis for determining claimant's average weekly wage, in that (1)

there was no showing that he had worked in the same employment for substantially the whole of 1943, or (2) that any other employe of like class in the same or similar employment had been so employed. In the first place, it can hardly be said that plaintiff's period of employment during the preceding year raised any fact issue under either subsection 1 or 2, considering the affirmative requirements of each section that such employe's average annual wage shall consist of 300 times the average daily wage. See Petroleum Casualty Co. v. Williams, Tex.Com.App., 15 S.W.2d 553, 555, holding "that *substantially a year,* within the meaning of subdivisions 1 and 2, is exactly 300 days or close to, or near to 300 days. It may be slightly more than 300 days or slightly less than 300 days. That is to say *substantially a year* means a year or about a year, or so near a year as to be a year for all practical purposes." It follows that jury issue and finding 12, also component finding 13, may be disregarded as without support in the evidence and immaterial to the court's judgment. Similarly, the undisputed evidence eliminated subsection 2, Art. 8309, § 1, as a material issue (conditionally submitted in issues 14 and 15, not answered); the court properly resorting to subsection 3 of the statute (issue 16); and the jury finding, in response, of an average weekly wage of $26 (just and fair to both parties) was a sufficient basis for the court's rendition.

Appellant argues that the definition of "total incapacity of left eye" was incomplete, the jury thereunder having no opportunity to consider defendant's theory of the case, namely, evidence of specialists that by use of glasses plaintiff's vision was normal. Schedule 12 of specific injuries, Art. 8306, provides: "For the total and permanent loss of the sight of one eye, 60 per cent. of the average weekly wages during 100 weeks." "In the foregoing enumerated cases of permanent, partial incapacity, it shall be considered that the permanent loss of the use of a member shall be equivalent to and draw the same compensation as the loss of that member"; which provisions have been given construction in Great American Indemnity Co. v. Stultz, Tex.Civ.App., 56 S.W.2d 200, 202,

(writ ref.), viz.: "In regard to said statute as relating to the loss of sight, it will be observed that one of the enumerated cases of 'permanent, partial incapacity' to labor is 'the total and permanent loss of the sight of one eye,' which in turn means (for the practical purposes of sight) the loss of the function of the eye as an organ of sight, or simply the loss of the eye, a member of the body. The one is the equivalent of the other."

Dr. Harrington, called by defendant, stated that plaintiff had a "pretty severe burn" to eye on first examination, January 14, 1944; giving him some 25 to 30 treatments over a time extending to February 26, when the patient was discharged. In letter to insurer, of February 14, witness said claimant's eye had improved for a few days, then developing an ulceration around margin of cornea, when he was hospitalized and given intravenous injections of typhoid vaccine. Dr. Harrington further testified that on discharge, plaintiff had fully recovered from the injury of January, both eyes being normal with the exception of nearsightedness, a condition existing before the accident, or congenital; that by use of glasses he had been able to bring the vision of both eyes to 20/20, or normal, but did not fit plaintiff with glasses because nearsightedness was something for which he considered the insurance company not responsible. During the trial (February 1945), and by agreement, claimant was again given a series of tests at the office of Drs. Harrington and Knowles, with Dr. Jenkins, another specialist, participating at instance of plaintiff's counsel; both specialists, first named, concluded that the eyes of Davis were normal, aside from nearsightedness, which could be corrected with glasses; Dr. Harrington narrating the statement of Dr. Jenkins, made during the examination, that "he could find nothing wrong" with claimant.

On the other hand, Ardell Davis testified in part:

"Q. Before this lye-water splashed in your eye had you ever had any trouble with your eyes in your life? A. No sir, I never did.

"Q. Had you ever injured them in any way in your life, either one of them? A. No sir.

"Q. Did you ever have any difficulty in seeing out of them before this accident happened? A. No sir.

"Q. Out of either one of your eyes? A. No sir. * * *

"Q. At the time he (Dr. Harrington) discharged you were you seeing out of your left eye like you did before you got this lye in it? A. No, I can't see out of it now to do no good.

"Q. Could you read all right with your left eye before you got this lye in it? A. Yes sir.

"Q. Can you read with it now? A. No sir.

"Q. What happens if you have a print big enough for you to see, what happens to you if you try to read? What do you see when you try to read? A. Well, if I look at one thing it looks like four, and if I try to read the letters all go together; I can't tell one from the other. They all go together. Now, it looks like a fog between me and that wall over there now. It is foggy looking and my eyes are hurting right now, continually hurting."

Dr. Brann, also specializing in eye, ear, nose and throat medicine, called by plaintiff, testified that on examination of plaintiff in April 1944, he "found the left eye quite highly inflamed. There was an abrasion on the lower lid, and conjunctivitis with some infection. The pupil was contracted and wouldn't react to light, and by dilating the pupil I could see the fundus of the eye and congestion of the optic nerve." This witness saw claimant in June 1944, just prior to the court trial; stating in part:

"Q. When you saw him in June that was in '44, I presume? A. Yes.

"Q. What did you find at that time? A. Well, there was still an irritation and some infection and the pupil was still contracted. The vision hadn't improved. * * *

"Q. What did you find on the 19th day of February? What did you find then? A. There was some improvement in the

conjunctiva. There wasn't so much infection, and the abrasion had healed, but there was still the abrasion of the conjunctiva, that is the lid fell over the eyeball, and the pupil was contracted and his vision, he saw an object he should see at 40 feet, he saw at 5 feet.

"Q. That was in February of this year? A. Yes.

"Q. About what percentage of loss of vision would that be? A. For all practical purposes, for useful purposes that is practically nil.

"Q. When you say 'nil' you mean practically nothing? A. Yes, as far as useful purposes are concerned. * * *

"Q. Dr. Brann, from these three examinations what is your opinion with reference to whether or not this condition as you last saw it on February 19th, 1945, will improve or stay the same or worse or what? A. I have my doubts that he will get any improvement because it has gone on practically a year with no improvement and I doubt if he will get any improvement. * * *

"Q. For what length of time then? A. That would be the rest of his life. * * *

"Q. Dr. Brann, what is the extent in percentage of the use or ability of Ardell Davis to use his left eye for the performance of manual labor as you saw it on February 19th, 1945? A. As far as his left eye is concerned I would say he has no useful vision. * * *

"Q. Would the glasses help the vision in the left eye? A. I have my doubts as to that.

"Q. You wouldn't know about that until you tried it, would you? A. My opinion is no."

■ The jury were instructed that the phrase "total incapacity of his eye" means "total loss of use of the eye; it does not imply an absolute disability to perform any kind of labor, but such incapacity of the eye that it disqualifies a person from performing the usual tasks of a workman in such a way as to enable him to procure and retain employment requiring the use of said eye, is ordinarily regarded as total incapacity of the eye." While the specific injuries scheduled in sec. 12, Art. 8306, carry compensation per se, i. e., for physical disability without reference to incapacity for labor, it is well settled that the "character of use of a specific member, for the loss of which use compensation is awarded, includes the use of such member for the purpose of work." Traders & General Ins. Co. v. Maxwell, Tex.Civ.App., 142 S.W.2d 685; Fidelity Union Casualty Co. v. Munday, Tex.Com.App., 44 S.W.2d 926.

■ As supplementing above instruction, defendant requested a charge involving "total loss of vision"; that by such phrase is meant "that such person has sustained the total loss of vision or eyesight in such eye and that the same is an irrevocable loss and no mechanical process or method known to man can restore that vision or any portion thereof." There was no error in the definition given by the court, nor in its refusal of the requested instruction, because (1) the quoted charge and issue 2 in connection, have been held to correctly present the claim of specific injury involving "permanent partial incapacity" under sec. 12, Art. 8306 of the statute; see Traders & General Ins. Co. v. Maxwell, supra, and authorities cited; (2) under aforesaid definition of "total incapacity of eye" the jury was authorized to take into consideration all evidence relevant to "total loss of use of the eye" inclusive of defensive testimony that glasses would fully restore plaintiff's vision; also opposing statements of Dr. Brann that glasses would prove ineffectual; (3) and, aside from unduly limiting the court's definition of statutory incapacity, the refused instruction was a comment on the weight of particular evidence, giving undue emphasis to defendant's theory of the case.

■ But appellant argues that even plaintiff admitted on the trial of having *some* vision in his left eye, the fact situation becoming thereby identical with Travelers Ins. Co. v. Richmond, Tex.Com. App., 291 S.W. 1085. We do not find in the statement of facts (pp. 69, 70) the admission referred to or anything contradictory of plaintiff's testimony already

quoted. Nor are we able to determine the present authoritative value of Travelers Ins. Co. v. Richmond on the points under discussion. See Great American Indemnity Co. v. Stultz and its reference to Fidelity Union Causalty Co. v. Munday, supra. We do know the more recent decisions hold, in effect, that under our compensation law, an employe is entitled to recover for loss of eyesight when, by reason of injury, there remains no usable vision. Texas Employers' Ins. Ass'n v. Thrash, Tex.Civ.App., 136 S.W.2d 905; Maryland Casualty Co. v. Gunter, Tex.Civ. App., 167 S.W.2d 545. The Richmond case is distinguishable, however, in that there the claimant's testimony was taken as admitting the existence of *some* vision; while here, under the foregoing testimony of plaintiff and Dr. Brann, the issue of total incapacity of left eye was clearly drawn.

■ In connection with issue 16 above, the jury were instructed "that you may determine the weekly wage in any way and manner that seems just and fair to both parties under the evidence, and his wages may include the market value of board and other advantages which can be estimated in money which the employee receives from the employer as part of his remuneration." Appellee's bases of wages received in his employment when injured have already been narrated, except for the statement that at first his employment with the cafe was for $18 per week, and the further testimony of employer De George that the value of meals per week ranged from $4.80 to $6.60. Appellant argues that issue 16 and the "instruction" were objectionable because all evidence of earnings thereunder related to the De George employment; and, in consequence, the jury were confined to a consideration of the wages received by claimant at time of injury as the amount deemed just and fair to both parties. Both issue and explanatory charge were in language of the statute, and under no reasonable construction thereof was the jury told to base its findings on what Davis was earning at time of injury; the jury being thereby authorized to consider such wages but not required to do so. The testimony as a whole is inclusive of claimant's age (45), his previous employment and present earning capacity; thereby compatible with compensation law requirements that under subsection 3 "No hard and fast rule can be announced that will govern the board in all instances. The statute clearly intends to clothe the board (or jury) with broad discretionary powers in considering matters that bear on the question to be determined." Traders & General Ins. Co. v. Bulis, 129 Tex. 362, 104 S.W.2d 488, 490; and in Maryland Casualty Co. v. Drummond, Tex. Civ.App., 114 S.W.2d 356, 360, (writ ref.), referring to sec. 3, the court said: "It seems to us that evidence to be 'pertinent' to the ascertainment of the just and fair wage rate contemplated should tend reasonably to establish the capacity of the claimant to earn in the same or similar employment to that in which he was engaged at the time of his injury. We do not understand the Bulis Case to hold otherwise. We think the compensation statute clearly contemplates that the earning capacity covered by the compensation insurance shall bear a direct relationship to the capacity of the insured to earn wages in the employment in which his injury is received." The objections are overruled.

■ Further complaint is made of plaintiff's response to an introductory question that his son was in the army overseas, citing American Employers Ins. Co. v. Kellum, Tex.Civ.App., 185 S.W.2d 113. The two fact situations are dissimilar; here, defendant's protest coming after the completed question and answer, the objection being on no particular ground except immateriality. Where no objection is urged until after testimony is in, and no motion to exclude it is made, it is generally held that a complaint on appeal of its admission is without merit. 41 T.J., sec. 142, p. 905; Pittman v. Stephens, Tex.Civ.App., 153 S. W.2d 314; likewise as to an objection that certain evidence is simply "immaterial." Peerless Oil & Gas Co. v. Teas, 138 Tex. 301, 158 S.W.2d 758.

No reversible error appearing, the judgment appealed from is affirmed.

LOONEY, J., concurring.

BOND, Chief Justice (dissenting).

I respectfully dissent from the majority, adhering to our former opinion.