## UNITED STATES CAS. CO. v. BARLOW.
### No. 4827.

Court of Civil Appeals of Texas. Beaumont.
Sept. 11, 1952.

Rehearing Denied Oct. 1, 1952.

King, Sharfstein & Reinstra, Beaumont, for appellant.

John P. Howell, Howell & Howell, and Joe S. Maida, Jr., all of Beaumont, for appellee.

R. L. MURRAY, Justice.

This is a Workmen's Compensation suit brought by Clarence Barlow, the appellee, against the United States Casualty Company, appellant, to recover compensation under the Texas Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq., for the alleged total and permanent loss of the use of his right eye. On trial the appellant admitted the fact that an accidental injury was suffered by the appellee, but de-

nied that his loss of vision in his right eye was either total or permanent. Upon the trial the jury found by its verdict, rendered upon Special Issues submitted, that he had suffered the total and permanent loss of the use of his right eye. In the charge the court gave the instruction to the jury that by the term "total loss of the sight of the eye" was meant "the loss of the function of the eye as an organ of sight." No objection was made to the definition.

Judgment was entered for the appellee upon the verdict of the jury. The court overruled the appellant's amended motion for new trial and thereafter it perfected its appeal to this court for review.

The appeal is brought on 6 Points of Error. The first point is that there was no evidence to support the finding of the jury that appellee sustained a total loss of the sight of his right eye and the second point is that the evidence in that respect was insufficient to support such a finding of the jury. The third point is that there was no evidence to support the jury's finding that a total loss of sight of the right eye would be permanent and the fourth point is that such evidence was insufficient to support such a finding. Point No. Five is that the trial court erred in overruling its objection to the submission of the issue in regard to total loss of the sight of the appellee's eye, on the ground that there was no evidence to support a finding by the jury of total loss of sight and the sixth point is that the trial court erred in overruling its objection to the submission to the jury of Special Issue No. 2, which inquired whether such loss of sight inquired about in Special Issue No. 1 was permanent or temporary.

Since Points 3, 4, 5, and 6 are based upon the appellant's contention that there was no evidence or insufficient evidence of the total loss of the sight of the eye and that therefore there was no evidence or insufficient evidence that there was a permanent total loss of the use of such eye, we will consider Points 1 and 2 only in this discussion. The outcome of this appeal must, of course, depend upon the determination of those first two points.

In its argument under Points 1 and 2 the appellant quotes from and relies upon Travelers Insurance Co. v. Richmond, Tex. Com.App., 291 S.W. 1085; Employer's Casualty Co. v. Watson, Tex.Civ.App., 32 S.W.2d 927; Traders & General Insurance Co. v. Valentine, Tex.Civ.App., 81 S.W.2d 187 and Traders & General Insurance Co. v. Dwyer, Tex.Civ.App., 104 S.W.2d 63. All three of the latter cases are based upon the holding in Travelers Insurance Co. v. Richmond, supra. In that case it was held by the Commission of Appeals in an opinion adopted by the Supreme Court that even though there was testimony to the effect that the plaintiff there had 99 percent disability of his eye the evidence did not support a finding of total loss of the use of the eye, since "total" generally comprehends all of a thing. If the ruling in the Richmond case is the law now, all of the appellant's contentions on this appeal should be sustained, but we are convinced that such holding is no longer the rule in Texas.

█ It is said in the case of Aetna. Casualty & Surety Company v. Davis, Tex. Civ.App., 196 S.W.2d 35, 45, "the more recent decisions hold, in effect, that under our compensation law, an employe is entitled to recover for loss of eye sight when, by reason of injury, there remains no usable vision." That opinion cites the cases of Texas Employers Insurance Association v. Thrash, Tex.Civ.App., 136 S. W.2d 905; Maryland Casualty Co. v. Gunter, Tex.Civ.App., 167 S.W.2d 545. We believe that is the rule in effect today.

█ With this rule in mind, as stated in the Davis case, supra, the evidence in behalf of appellee in the instant case in regard to his loss of vision of his right eye is summarized.

On the trial the appellee testified in his own behalf that he was loading a truck with shaved steel for his employer and a sharp point like a needle struck him in the right eye; it hurt, felt like a needle had stuck him in the eye; before this he had never had any trouble with either of his eyes and after the steel struck him in the

right eye he cannot see out of the eye— sees nothing but fog in front of that right eye, and that it has been that way from the time of the accident up to the time of the trial. He was sent to the company doctor who treated him for about three months. He then told him that was all he could do for his eye; that doctor got the piece of steel out of his eye. At a later date, the week before the trial, this same doctor had examined him again and had given him some tests, during which he could see with his left eye but could not see with his right. The vision in the eye had not improved any since the date of the accident. In the opinion of the witness the loss of vision was going to last the rest of his life.

On cross-examination he made statements in regard to the extent of his vision or loss of vision in the right eye which the appellant points to as being admissions on his part that he had not lost the total use of his right eye, under the rule announced in the Richmond case. This testimony is quoted verbatim by the appellant in its brief and we will therefore quote it in the same way, as follows:

"Q. Put your hand over your left eye so you can't see out of the left eye. Now you are looking out of the right eye? A. Yes, sir.

"Q. You can see me, can't you? A. I can see you, but it looks like you are just a little bitty outfit over there.

"Q. You can see the lawyer over here, can't you? A. I can see him but I can't make him out.

"Q. Can you see this juror over here? A. No, sir.

"Q. Can you see the one over yonder? A. Which one? I see the one right here.

"Q. Now, Clarence, I am pointing, and you could see where I am pointing, couldn't you? A. No, sir.

"Q. How did you know I told you to look at that man yonder? A. I'm looking at this one right here; I can't see the one on the back.

"Q. Before you took your hand away from your eye, you couldn't see me over here, could you? A. No, sir.

"Q. But you turned around over here where I was? A. I couldn't see you.

"Q. Can you see the Judge over there? A. Yes, I can see the Judge that close. I can see that close, but far apart I can't see.

"Q. How far can you see? A. About from here to the Judge here.

"Q. You can see me, but I look little; is that right? A. You look small. I can't make you out.

"Q. Can you see me here? A. I can't make out that far.

"Q. You can tell I am standing up now, can't you? A. No, sir, I can't.

"Q. Can you see that window, over here? A. I sure can't, no, sir.

"Q. Can you see this window there (indicating)? A. Yes, sir, I can see that, that close.

"Q. Can you see that fan up there? A. No, sir.

"Q. You know which fan I'm talking about, don't you? You looked right up there where it is? A. I can't see it.

"Q. That's all."

A physician called by the appellant also testified in regard to the condition of his eye and the appellant in its brief quotes the following testimony of that physician, which it contends shows that appellee's loss of vision in the right eye was not total:

"Q. Did you examine him for the purpose of treating him? A. I examined him to see what, if anything, I could do about his vision, and see if I couldn't improve his general health regarding the eye.

"Q. Doctor, what were your findings? A. My findings were those of loss of vision in the injured eye, loss to the extent of what we know as 20/400.

"Q. Doctor, about what percentage of loss of vision would that be for

useful purposes and or practical purposes? A. In the injured eye?

"Q. Yes. A. 20/400 broken down on an industrial chart of visual efficiency amounts to slightly over 96%, 96.7% if I recall my tables correctly.

"Q. Is it your testimony that any usable vision now remains in this boy's eye for all purposes? A. Outside of allowing him to get around, just discovering where light is. For perception, the answer is no. In otherwords, he can discern a light; and he might possibly tell you which direction that light might be moving."

On cross-examination said eye specialist testified:

"Q. You did clear up that redness? A. The redness cleared up, but from time to time I have no doubt that that eye might become red, as they sometimes do following any irritation of an eye. Then after that I tested his vision. Vision is tested by means of a chart which is so set up that at 20 feet the rays of light from the letter on the chart makes an angle of about 5 degrees, and a person that is able to see a certain height of letter at 20 feet is designated as 20/20, which we arbitrarily call normal vision. The next line above that subtends a larger angle; we call that 20/30; and on up the scale until we get a big letter, a big E, and that is designated as 20/400 vision.

"Q. About how large a letter is that? A. Well, about the size of your head.

"Q. It is a height about the size of my head? A. Yes, sir.

"Q. Would you say that would be a little less than a foot? A. It is less than a foot in height.

"Q. He could see that letter couldn't he? A. No, he could just barely see a haze there; he couldn't even tell me which direction the prongs

of the E—he couldn't even discern which direction the E was going; and on that basis I called it 20/400.

"Q. He could tell there was a letter there, though? A. He could tell there was something, a light there."

Said eye specialist further testified that from his examinations of plaintiff's right eye he could find absolutely no evidence of any injury, structural defect or disease, nor could he find any reason why plaintiff should have any loss of vision.

On re-direct examination Dr. Kaplan testified:

"Q. Now, Doctor, do you have 'illiterate' charts? You mentioned something about a big E. Do you have illiterate charts? A. Yes. I failed to mention this, too, in my examination. The man can't read. However, I have a special chart for those cases, which has figures—in other words, objects, instead of letters, but cut at the same angle; there is a big sheep; there are circles; there are stars; and by that means we can get the same response that we can from letters.

"Q. And, Doctor, that 20/400 is based on that illiterate chart? A. Yes, sir.

"Q. 20/400 is something from a medical standpoint that is practically no vision; is that right? A. It adds up to slightly over 96% loss of vision."

The above quoted testimony is not in our opinion an admission that the appellee had not lost the total use of his right eye. We believe that it is sufficient to support the finding of the jury to the effect that the appellee had totally lost the function of his right eye as an organ of sight. The appellant's points, therefore, are overruled, since all points are dependent upon its contention that there was no evidence, and that the evidence was insufficient, that there was a total loss of vision in this man's right eye.

Affirmed.