**TEXAS EMPLOYERS' INS. ASS'N**

v.

**RODRIQUEZ.**

No. 10171.

Court of Civil Appeals of Texas. Austin.

Nov. 25, 1953.

Rehearing Denied Dec. 16, 1953.

Eskridge, Groce & Hebdon, San Antonio, for appellant.

G. Woodson Morris, San Antonio, for appellee.

ARCHER, Chief Justice.

This is a Workmen's Compensation suit filed by appellee against appellant on appeal from an award of the Industrial Accident Board.

The appellee alleged that while in the employ of the Superior Woodwork Company, a stack of lumber fell on his right foot causing injuries to his foot, right leg, hips and back, and that such injuries are permanent and lasting, and that he has been totally incapacitated from performing labor of any kind, or that he has in any event been partially incapacitated from performing labor of any kind, and that same is permanent.

On trial to a jury the jury found, in replying to special issues, that the appellee sustained total incapacity which was permanent.

Based on the jury verdict judgment was entered against appellant in the sum of $1,518.86 with four percent interest, plus an additional sum of $18.18 per week for a period of 309 weeks, and for a lump sum payment, provision for attorney's fees, etc.

The appeal is based on five points and are to the effect that there is no basis for a judgment for total permanent incapacity

because no issue was submitted to enable the jury to find whether or not the appellee sustained any injuries to his body as a whole on the day of the accident, and no evidence to support the finding of the jury that appellee sustained total permanent disability as a result of his injury, and that the evidence is insufficient to support the verdict of the jury of total permanent incapacity for the injuries sustained; that in the submission of question No. 1 the court commented upon the weight of the evidence by assuming that appellee had sustained an injury to his body as a whole; in that such matter was a highly disputed fact issue, and finally that the charge was insufficient as the basis of a judgment because of the failure to submit issues inquiring whether the appellee or any other employee worked substantially the whole of the year in that appellee had the burden of negativing these issues.

The plaintiff in his original petition alleged:

"*Second*: Plaintiff further alleges that on or about the 22nd of February, 1951, he was in the employ of the Superior Woodwork Company, in San Antonio, Texas, and that on said date of February 22nd, 1951 in the course of his employment with said company, a stack of lumber fell on his right foot, breaking a number of the bones therein and also, by reason thereof, right leg, hips, and back were injured, and that all of said injuries are permanent and lasting, and that he has, by reason thereof, been totally incapacitated from performing labor of any kind, and that same is permanent, or that he has, in any event, been partially incapaciated from performing labor of any kind, and that same is permanent."

By trial amendment appellee pleaded:

"That the injuries set out by him in the Second Paragraph of his Original Petition as having been received on February 22, 1951, extended to or affected other portions of his body and that, as a result thereof, he has been totally incapacitated from performing labor of any kind and that same is permanent, or that he has, in any event, been partially incapacitated from performing labor of any kind, and that same is permanent."

Appellant denied appellee's allegations generally and specifically alleged that appellee did not sustain either total permanent disability or permanent partial disability as a whole, but that the injury was limited to the fourth and fifth toes of his right foot, and that at all times since the accident his injury had been confined to the fourth and fifth toes of his right foot.

We do not believe that the charge of the court was insufficient as the basis of a judgment because of the failure to submit issues inquiring whether the appellee or any other employee worked substantially the whole of the year before the accident.

Subsection 3 of Section 1 of Article 8309, Workmen's Compensation Law, V.A.C.S., provides:

"3. When by reason of the shortness of the time of the employment of the employe, or other employe engaged in the same class of work in the manner and for the length of time specified in the above subsections 1 and 2, or other good and sufficient reasons it is impracticable to compute the average weekly wages as above defined, it shall be computed by the board in any manner which may seem just and fair to both parties."

The appellee alleged in paragraph Eight:

" * * * but that, in the event he is mistaken in his allegations that he had worked in the employment in which he was working at the time of his said injuries substantially the whole of the year immediately preceding same, then he says that an employee of the same class as himself, working substantially the whole of the year immediately preceding his injuries in the same employment or in a similar employment in which the plaintiff was working at said time in the same place or in a neighbor-

ing place to the place in which plaintiff was working at said time earned the sum of $5.40 per day therein, but that if neither plaintiff nor another employee was so engaged in the same class of work in the manner and for the length of time as is hereinabove provided, then he says that his average weekly wage at the time he was so injured, computed in a manner which would be just and fair to plaintiff and defendant has, under said Act, as the insurer of the said Superior Woodwork Company become liable and indebted to him on account of his total and permanent incapacity for work by reason of said injuries in the sum of $18.69, as being 60% of the average weekly wages provided for under said law, for a period of 401 weeks, * * *."

Appellee testified:

"Q. How much were you making at the time you got hurt, per hour? A. Sixty cents an hour.

"Q. How many hours a day? A. Nine.

"Q. How many days a week? A. Five days a week.

"Q. Ask him to count how many days a week he worked? A. Five and a half days.

"Q. Tell us whether or not you worked as many as three hundred days the year before February 22, 1951, that is the twelve months prior to February 22, 1951, whether you worked as many as three hundred days? A. No, sir.

"Q. Tell us whether or not you know anybody in this vicinity here, doing the same kind of work that you were doing, who worked as many as three hundred days during the year prior to February 22, 1951? A. No, sir.

"Q. Tell us whether or not you have inquired to try to find out whether anybody in this neighborhood—

"The Interpreter: What is that?

"Q. Tell whether or not you have inquired, in an effort to find out, if anybody, doing the same kind of work that you were doing at that time, worked as many as three hundred days during the year prior to February 22, 1951? A. I didn't find nobody."

The appellee had previously testified that he had been in the employ of Superior Woodwork Company prior to the accident four or five years.

H. E. Keller, witness, called by appellant, testified that he was superintendent of Superior Woodwork Company and that he did not think there were any men doing the same kind of work that appellee was doing who worked 300 days the year before the date of the accident.

█ This testimony, together with that of appellee, was sufficient to negative the fact that subsections one and two are applicable, and the jury finding of average weekly wages which was just and fair to both parties under the statute was a sufficient basis for the court's rendition of judgment based upon such finding. Traders & General Ins. Co. v. Weatherford, Tex.Civ. App., 124 S.W.2d 423 (writ dism., judgm. cor.). Aetna Casualty & Surety Co. v. Davis, Tex.Civ.App., 196 S.W.2d 35.

█ We believe that the evidence reasonably supports the jury's finding that the injuries sustained by the appellee extended to and affected his body generally, apart from his fourth and fifth toes, and it is admitted that such toes were injured. The evidence is that appellee has been unable to work since his injuries.

We have set out portions of the appellee's pleadings hereinabove by which allegations are made that the injuries extended to and affected other portions of his body, etc.

The testimony of appellee is that since the time of the accident he has not been able to work, has suffered continually, and that he was treated by the physician to whom he was taken by his employer, who bandaged his foot and had X-rays made; that he left

the doctor's office on crutches. On the following day appellee returned to the doctor and his foot was dressed, and continued to be treated for two or three weeks, being carried there by the company; that thereafter for about twelve weeks he went to the doctor's office, accompanied by either his wife or son, and was then told that he was o. k. Appellee further testified as follows:

"Q. Now, after those twelve weeks, tell this jury how you felt in your body? A. I felt bad. My foot was swollen.

"Q. Tell him 'felt bad' doesn't mean very much. Let us get it more specific. Use the word 'specific', Mr. Interpreter. What part of his body, if any, hurt him? A. My right foot and all of the leg, up to my back. I still have pain in the back.

"Q. Will you point out on me about your back—point out on me here about where your back pains you. A. Right there.

"Q. Can you tell us when the pain in your back started, if you can? A. About a week after.

"Q. A week after what? A. A week after the accident.

"Q. Now, what kind of pain is that? We want to know whether it was a sharp pain or a light pain. Tell him we want to know the character of the pain. A. A very strong pain.

\* \* \* \* \* \*

"A. Yes, he sent me.

"Q. Now, when Mr. Steves looked at your foot, tell us what was the aspect, how did your foot look if you can tell us? A. It was very much swollen, I had the shoe cut.

"Q. Tell us whether or not you went back to the same doctor? A. He sent me to see him.

"Q. Well, he can answer that 'Yes' or 'No', can't he? Tell us whether or not you went back to see the same doctor? Yes, sir.

"Q. Did the same doctor see you? A. The same doctor.

"Q. What, if anything, did he do for you, do with you, at that time? A. He took hold of my foot and lifted it up, the place where they took the X-rays.

"Q. Anything else? A. Then he told me I could go home, that he would send for me later.

"Q. Did you go home? A. Yes, sir.

"Q. Did he ever send for you later? A. No, sir.

"Q. Has he ever seen you since? A. No, sir.

"Q. I mean have you ever seen him since in his office? A. No, sir.

\* \* \* \* \* \*

"Q. Now, after that, tell us whether you ever went to see Dr. Carlos Urrutia here in San Antonio? Yes, sir.

"Q. Do you know how many times he treated you or not? A. About three times, probably five.

"Q. Tell us, Mr. Rodriguez, please sir, whether or not since you were hurt, as you have told us about, you have ever done any work of any kind? A. No, sir.

"Q. Tell us whether or not since that time you have ever felt like doing any kind of work? A. Yes, sir, but I can't.

\* \* \* \* \* \*

"Q. (by Mr. Morris) Have you felt able to work? A. No, sir.

"Q. Can you read and write? A. No, sir.

"Q. What kind of work have you done all of your life prior to your accident? A. Just working; picking up lumber.

"Q. How much were you making at the time you got hurt, per hour? A. Sixty cents an hour.

"Q. How many hours a day? A. Nine.

"Q. How many days a week? A. Five days a week.

"Q. Ask him to count how many days a week he worked? A. Five and a half days.

"Q. Tell us whether or not you worked as many as three hundred days the year before February 22, 1951, that is the twelve months prior to February 22, 1951, whether you worked as many as three hundred days? A. No, sir.

"Q. Tell us whether or not you know anybody in this vicinity here, doing the same kind of work that you were doing, who worked as many as three hundred days during the year prior to February 22, 1951? A. No, sir.

"Q. Tell us whether or not you have inquired to try to find out whether anybody in this neighborhood—

"The Interpreter: What is that?

"Q. Tell us whether or not you have inquired, in an effort to find out, if anybody, doing the same kind of work that you were doing at that time, worked as many as three hundred days during the year prior to February 22, 1951? A, I didn't find nobody.

"Q. Did you look? A. Yes, I did."

On cross-examination appellee testified that he had been to other doctors since the first treatments.

The testimony of a physician called by appellee is that he had examined appellee extensively of his back, both feet, and lower extremities to determine the extent of his injuries, and found:

"A. Well, sir. I found that he had tenderness of the dorsal surface of the right foot. He had partial ankylosis of the metatarsophalangeal joints of the first and fifth toes, more severe in the fifth toe. Arthritis on the first and fifth toes, that is the metatarsophalangeal joints of the fifth toe, first and fifth toes, and some spurring about distal head of the fifth metatarsal on the right foot, the site of the union, where callus is formed, disclosed from old X-rays, the site of an old fracture of the distal head of the fifth *metarsal* and the middle phalanx of the right fifth toe. Upon repeated examinations he seemed to continue to have, up to the present time an area of hyperthesia over the dorsal surface of the outer part of the right foot and he has continued to—

"Q. Don't use big words, please. A. Well, there is an increased tenderness. From this area he complains of pain that radiates up his leg. He walks with his knees slightly bent, and gives on the right foot in walking. He has complained regularly of pain in the lower right gluteal area, that runs up and down from the foot.

"Q. Just point that out there, if you will, please, Doctor? Where is that now? A. The hip area in here, down his leg.

"Q. Go ahead. A. Of course, a man of his age, sixty-five years old, you would expect to find some spasticity of the lower back. I thought that this was possibly aggravated by walking in this position, having to give to the right foot, the pelvic tilt to the right, which increased the load on the muscles of the low back. The posture in which he walks makes his back tire more quickly. I don't think a patient who walks in this posture would be able to do arduous labor and sustain it for a period of eight hours.

\*     \*     \*     \*     \*     \*

"Mr. Hebdon: If the Court please, 'it might'—

"Q. I want probabilities. I am asking him to deal with probabilities. A. Well, scar tissue protracted over a nerve will produce neuralgia.

"Q. What is the effect of this tilting of the pelvic that you speak about there, Doctor? A. Well, the patient walks with the hip dropped, it causes the muscles to tire more quickly than if he is able to walk in an erect posture and bear weight equally on both lower extremities.

"Q. What effect does that have, if any, in the area of the back, the small of the back, the lumbar area, does it have any or not? A. If continued over a long period of time it would cause the back to grow crooked often and cause those muscles to tire out more quickly.

\*    \*    \*    \*    \*    \*

"Q. Well, in view of the fact that he was injured in '51, what does that argue to your mind as to the permanency or otherwise? A. Well, sir, he is sixty-five years of age, and considering the injury I would think it is a total disability for the performance of heavy work at this time or arduous exertion; he has got a partial permanent disability.

"Q. Well, Doctor, tell us whether or not the first time you saw him this man could do hard manual labor? A. I don't think he could, and I don't think he can now.

"Q. In between times do you think he has been able to do hard manual labor? A. No, sir.

"Q. Well, tell this jury now whether or not you think now he is totally incapacitated from doing hard manual labor. A. Yes, sir.

"Q. Well, is that condition permanent or temporary? A. It is permanent as far as arduous exercise is concerned."

A physician specializing in X-rays called by appellant as a witness testified as to X-rays and that he did not see any reason why the appellee cannot return to work, from an X-ray standpoint.

Another physician, a surgeon, called by appellant testified that he had examined appellee, first in April, 1952, and second on the day of the trial, specifically about his back and leg, and also his heart and lungs. That on the first visit appellee, using his son as an interpreter, gave a case history of having some lumber fall on his right foot and was complaining of his foot and also of pain in his leg, his hip and his back, especially on the right side.

X-rays were taken and revealed that appellee has an ununited fracture of the middle bone of the little toe and some arthritis was revealed in his back, and testified:

"Q. Now, what sort of an examination did you perform on his back? A. I palpated his back and had him make different motions with his back to see whether or not he had any spasticity of any muscles; and then I had him to lie down and raise his leg and the knee flexed, that is, the knee bent to straighten out the lower leg, which put the tension on the muscles of the back, depending on which leg you raised, on that side of the back. That test is designed to show some irritation of the muscles in the back.

"Q. Well, did your test reveal anything? A. Not with reference to his back. He complained of pain in his knee and his leg, which is common in these cases. The test elicited no excruciating pain in his back at all.

"Q. Did you observe his walk? A. I did.

"Q. What did you observe with reference to his walk? A. He walks with a limp."

The first doctor to whom appellee was taken, called by appellant testified that he treated appellee on the day of the injury and found the injury to the right foot, but no other injuries, and treated the foot and continued to treat appellee until May 15, 1951, when he sent appellee back to work, but saw appellee again on May 21st at which time the wound had healed, but his

foot was still swollen, and he walked with a slight limp. Appellee returned again in November, 1951, but never made any complaint about his back and in the doctor's opinion he could have returned to work.

A physician called by appellee, an orthopedic surgeon, testified that he had examined appellee and detailed what he did, and tests he made in making the examination, and stated:

"Q. Doctor, what was your diagnosis from your study and everything of the back there? If you want to use any X-rays to illustrate that, all right. A. My conclusion of his back is that he has, from my findings, that he has a disk injury to the lower part of his back, and my—

\* \* \* \* \* \*

"Q. What causes an intervertebral disk to rupture? A. Well, it is—

"Q. Give us some of the main causes? A. Well, injury, such as too heavy a load being put on the back; a certain type of twisting would cause a disk to rupture.

"Q. Can a blow on the back cause it; jerking up right quick on the back, hitting the back, can that cause it? A. It can if it arches the back, yes.

"Q. Go ahead. A. As I said, when this wears out, the body throws out material such as bone and stiffness and as that continues we find that the bone is thrown out this way. We see that all the time.

"Q. Does a man always know when he gets an intervertebral disk right away? A. No.

"Q. Why don't he? A. An injury can occur in a disk and will gradually protrude out later on. He can have immediate severe pain or weeks or months later."

The doctor gave extensive testimony in addition to the parts we have inserted herein.

A physician called by appellant, specializing in neurological surgery testified that he had examined the appellee and as to the examination, tests made in connection therewith, and that he saw no evidence at all of a disk injury, or any evidence to indicate that there is an interference with the nerves in his back.

■ Extensive testimony was given by appellee and appellant and we have not undertaken to discuss such testimony as a whole but have referred to such as we believe is directly pertinent, and from what we have said and from the record as a whole it is evident that the issue of the extent of the injuries was closely contested, but the jury saw the witnesses, heard the testimony, and resolved the fact issues in favor of the appellee, and we believe was justified in so doing.

The court submitted issues as follows:

"Question No. 1: Do you find from a preponderance of the evidence that the incapacity, suffered by the plaintiff, Matias Rodriquez, on February 22, 1951, was total or partial incapacity?

"You will answer 'Total Incapacity' or 'Partial Incapacity'.

"We, the jury, answer: Total Incapacity.

"You are instructed that the term 'total incapacity', as used in the Workmen's Compensation Act, does not imply absolute inability to perform any kind of labor, but a person disqualified from performing the usual tasks of a workman in such manner as to enable him to procure and retain employment is regarded as being totally incapacitated or totally disabled.

"By the term 'Partial Incapacity', as used in this charge, is meant that a person is disqualified from performing the usual tasks of a workman, but is capable of performing a part thereof or labor of a less remunerative class whereby reduction in earning capacity is suffered.

"If you have answered Question No. 1 'Total Incapacity', then answer Question No. 2. If you have answered Question No. 1 'Partial Incapacity', then do not answer Question No. 2.

"Question No. 2: Do you find from a preponderance of the evidence that such total incapacity, if you have found total incapacity, was permanent or temporary?

"Answer 'Permanent' or 'Temporary'.

"We, the jury, answer: Permanent.

\* \* \* \* \* \*

"Question No. 11: What do you find from a preponderance of the evidence to have been the average weekly wage of Matias Rodriquez on February 22, 1951, computed in a manner which shall seem just and fair to the defendant and Matias Rodriquez herein?

"Answer by stating the amount, if any, in dollars and cents.

"We, the jury answer: Twenty nine dollars and seventy cents ($29.70).

\* \* \* \* \* \*

"Question No. 14: Do you find from a preponderance of the evidence that the physical injury to plaintiff, as a result of the accident sustained by him on February 22, 1951, is not confined to the 4th and 5th toes of plaintiff's right foot?

"Answer by stating: 'It is not confined to the 4th and 5th toes' or 'It is confined to the 4th and 5th toes.'

"We, the jury, answer: It is not confined to the 4th and 5th toes.

\* \* \* \* \* \*

"Question No. 15: Do you find from a preponderance of the evidence that the physical injury to the plaintiff, resulting from the accident on February 22, 1951, is not confined to his right leg below the knee?

"Answer by stating: 'It is not confined to his right leg below the knee', or 'It is confined to his right leg below the knee.'

"We, the jury, answer: It is not confined to his right leg below the knee."

We believe the charge of the court was a sufficient presentation of the controlling fact issues and the answers of the jury are reasonably supported by the testimony. Southern Underwriters v. Boswell, 138 Tex. 255, 158 S.W.2d 280; Texas General Indemnity Co. v. Scott, Tex.Sup., 253 S.W. 2d 651; Tex.Jur.Supp. 8, § 103; Texas Employers' Ins. Ass'n v. Godwin, Tex.Civ.App., 194 S.W.2d 593; Traders' & General Ins. Co. v. Weatherford, supra.

The judgment of the trial court is affirmed.

Affirmed.